Filed 7/31/20

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JONAS BROWN,<br><br>    Defendant and Appellant. | D075476<br><br><br>(Super. Ct. No. SCD272812) |

APPEAL from a judgment of the Superior Court of San Diego County, Frederick Maguire, Judge. Affirmed as modified.

Thomas Eugene Robertson, by appointment of the Court of Appeal, for Defendant and Appellant Jonas Brown.

Xavier Becerra, Attorney General, Lance E. Winters Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Felicity Ann Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

_____

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of the following parts: factual and procedural background, and parts 1, 2b, and 3 of the discussion.

Jonas Brown was tried for his involvement in three gang-related shootings. Tremayne Jones, a member of the Skyline gang and a confidential informant, died in the third incident. Among other counts, Brown was convicted by jury of the first-degree murder of Jones. On appeal, Brown asserts one trial error and three sentencing errors. He argues that: (1) the court prejudicially erred by failing to instruct the jury on voluntary manslaughter, (2) his conduct and actual custody credits were miscalculated, (3) two gang enhancements added to his sentence were unauthorized, and (4) the court was unaware of its discretion regarding a firearm enhancement. We agree with Jones that his actual custody credits and gang enhancements require correction, but otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are extensive, involving three shootings, two guns and dozens of witnesses. We limit our initial recitation of the facts to those pertinent to Brown's first-degree murder conviction since it is the only trial issue he raises. Procedural facts related to his sentencing are discussed in the relevant sections below.

Tremayne Jones was shot and killed in the middle of the afternoon on Encinitas Way, a neighborhood street. About a week later, Brown (who was known to police as a Skyline gang member) was pulled over for a traffic violation and arrested on an unrelated charge. He pleaded guilty and began serving his sentence. Only later was he charged with Jones's murder.

At trial, a spotty portrait of Jones's death emerged from the testimony of witnesses who lived on Encinitas Way—none of whom saw the entire event. Chance Lions was one of these residents. On the afternoon of the shooting, he was hanging around the house of his girlfriend, Alicia Williams. Both Lions and Williams noticed two cars parked out front, a black car and

2

another car parked in front of it.  Lions was about to enjoy an afternoon beer outside when he heard an argument happening in the street.  The tone made him think a fight was imminent.

Lions came around the side of the house to see what was happening and observed a young man (Jones) in the street yelling at people who Lions could not see.  A man sitting in the black BMW sedan gave Lions an intimidating glare and Lions retreated to the garage.  Other witnesses established that the man in the BMW was Tony Tabbs, another Skyline member who was with Jones that day.  After he heard gunshots, Lions came back out to see Jones wounded on the ground and Tabbs yelling for someone to call 911.  Jones did not survive, and Tabbs did not cooperate with investigators.

Police searched the scene for weapons, but only succeeded in recovering shell casings—six .9-millimeter jackets and one Aguila brand .25-caliber jacket—indicating two different guns were fired.  Ballistic analysis further concluded that the .9-millimeter casings were all ejected from the same gun, which was also the weapon used in an unsolved shooting a few months earlier.  Under the hood of the BMW, which was registered to Jones's wife, investigators recovered a Crown Royal bag with an Aguila .25-caliber bullet stashed inside.

The medical examiner who performed Jones's autopsy testified he was shot four or five times; he had five distinct gunshot wounds, but two may have been caused by the same shot passing through his body in two places. The entry points and angles of the wounds indicated Jones was probably shot from behind.  One of the bullets had a trajectory consistent with Jones falling forward as it struck him; the entry wound was below Jones's buttocks, and the projectile traveled upward, exiting his hip.  The bullet that killed him

entered his lower back, traveled through his spine, heart, and lung, and lodged in his upper chest. Another went through his back and exited near his armpit. This shot may have reentered his arm. He had one additional gunshot wound from a .25-caliber bullet that entered his left hand and lodged in his forearm. This one was different. There was soot at the entry wound, suggesting it was fired at very close range, and a comparison to the larger bullet recovered from his chest indicated the projectile came from a different gun.

Physical evidence circumstantially tied Brown to Jones's murder. A gun holster with Brown's DNA was left at the scene of another shooting where the same .9-millimeter handgun was used, cell phone tower data indicated Brown was near Encinitas Way when Jones was killed, and Brown was tied to an Audi that left the neighborhood right after the shooting. The prosecution also offered evidence to support their theory that Brown planned to kill Jones, a member of his own gang, because he thought Jones was a snitch.

Detective Joseph Castillo testified extensively about local gangs, Skyline specifically, and Jones's reputational problems with other Skyline members. Jones was a police informant. Castillo was Jones's handler, and the two were working together to set up controlled drug and firearm buys from Skyline members.

Although no arrests had yet occurred when Jones was killed, some Skyline members were already questioning Jones's loyalty due to rumors of his involvement in an earlier prosecution in Pennsylvania. Jones had testified against a former cellmate there, and the incident caught the attention of Skyline members after someone connected to the cellmate blogged about Jones's involvement. A forensic search of Brown's phone

4

showed the device was used to browse and take screenshots of these online articles.

To counter suspicion, Jones had the transcript of his testimony in Pennsylvania doctored to hide the extent of his cooperation. He then distributed these edited documents to Skyline members, apparently believing it would restore their trust in him. But a series of text messages between Brown and other Skyline members indicate it may have had the opposite effect. Brown texted that he did not trust Jones after reading the transcript and discussed the consequences of snitching. In an extended text exchange with Michael Dunbar, Brown also made a reference to shooting up Jones's new BMW. Dunbar responded he was thinking the same thing and they should get together to make a plan. Three days later, Jones was dead.

DISCUSSION

Brown claims he was entitled to a jury instruction on imperfect self-defense, but we find no error because there was no substantial evidence presented at trial that Brown shot Jones in fear for his life—reasonable or otherwise. Brown also challenges the calculation of presentence conduct credits because the court uniformly applied a credit-limiting statute for those convicted of murder to a period of custody before Brown had been charged with murder. However, case law and procedural history following our Supreme Court's decision in *In re Reeves* (2005) 35 Cal.4th 765 (*Reeves*) lead us to reject that claim. By contrast, we accept Brown's claim of error in the award of actual custody credits and make necessary corrections. Brown further contests the firearm and gang enhancements added to his sentence, arguing the court was unaware of its discretion to strike the former and that the latter were unauthorized. As we explain, there is no indication the court

5

was unaware of its discretion on the firearm enhancements, but Brown is correct that the gang enhancements must be removed.

1.  *Evidence of self-defense and the lack of a voluntary manslaughter instruction*

Brown contends the trial court erred by not instructing the jury on voluntary manslaughter under a theory of imperfect self-defense. To prevail, he must first show there was substantial evidence to support this theory of the case and then demonstrate the lack of instruction was prejudicial. We are not persuaded the evidence Brown points to was substantial enough to warrant an instruction. Even if somehow it were, he was not prejudiced.

When the evidence presented at trial lends substantial support to a lesser included offense, courts must instruct the jury accordingly. (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149 (*Breverman*).) This obligation remains even when the defense objects to the instruction or relies on a contradictory defense strategy. (*People v. Moye* (2009) 47 Cal.4th 537, 541.) But a court's duty to instruct on its own initiative only arises if substantial evidence supports the conclusion that "the lesser offense, but not the greater, was committed." (*Breverman*, at p. 162.)

Voluntary manslaughter is a lesser included crime within murder. (*People v. Barton* (1995) 12 Cal.4th 186, 200–201.) Imperfect self-defense is not a complete defense to an unlawful killing, but rather a theory under which murder is reduced to manslaughter "when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury." (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.) In a case such as this, any alleged error in jury instructions on lesser included offenses are evaluated for prejudice in accordance with *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Beltran* (2013) 56 Cal.4th

6

935, 955.)  Under the *Watson* test, Brown must show it was reasonably probable a more favorable result would have occurred if the jury had been instructed on voluntary manslaughter.  (*Watson,* at p. 836.)  Our review "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error" considering the relative strength of all the evidence.  (*Breverman*, *supra*, 19 Cal.4th at p. 177.)

Brown asserts there was substantial evidence he actually believed he needed to defend himself.  His central claim is that there were indications Jones *pulled his gun first* on Brown, who then reacted by shooting Jones.  In support of this account, Brown points to four pieces of evidence:  (1) Chance Lions heard Jones yelling; (2) Tabbs gave Lions an intimidating look; (3) Jones was likely armed; and (4) Jones likely shot himself in the hand.

The first point—that Lions heard Jones yelling and inferred from the tone that things were "getting ugly"—does very little for Brown's claim.  At most, it shows that Jones might have been angry.  But it does not lend any real support to the specific contention that Jones pulled his gun first.  The second point is even weaker because it involves the conduct of Tabbs, not Jones himself.  That Tabbs glared at Lions is consistent with the tense scene Lions described—presumably a nonverbal warning to mind your own business—but has no tendency to indicate Jones took out his weapon before Brown did.

As to the remaining particulars, we agree there is substantial evidence that Jones was armed and shot himself in the hand.  One casing from an Aguila brand .25-caliber bullet was recovered from the scene, and the bullet that was lodged in Jones's left hand was that same caliber.  Soot indicated his hand wound was sustained at very close range—within a few inches of the gun.  Another (unfired) Aguila brand .25-caliber bullet was recovered from a

7

bag in the engine compartment of Jones's car. And Jones was known to be right-handed.

But the conclusion that Jones had a gun and shot himself simply has little to no bearing on who fired first. It is just as likely that Jones took out his gun in self-defense, *after* Brown either brandished a weapon or shot him. Brown believes the self-inflicted wound supports an inference that Jones pulled out his gun and misfired before Brown fired at all. But we are not convinced. If the misfire tends to show anything at all, it lends slight support to the idea that Jones was already panicked or wounded when he reached for his weapon, which made an accidental discharge more likely.

The evidence Brown cites does not substantially support a sequence of events in which Jones pulled his gun first and caused Brown to fear for his life—either reasonably or unreasonably. But even if we entertain that notion, he was not prejudiced. The weight of the evidence as a whole leads us to believe a reasonable jury would not be likely to conclude Brown feared for his life if they had been instructed on voluntary manslaughter. Two aspects of the case simply overwhelm that narrative with a stronger one in which Brown planned and carried out Jones's execution.

The first is that Jones was shot from behind. Brown asserts the medical examiner's testimony on this point was uncertain, but there is little ambiguity in the record. The fatal bullet entered Jones's low back, traveled through his torso, and lodged in his upper chest. Another entered his upper leg from the back and came out through his hip, traveling upward. A third again entered his back and exited his armpit. Three entry wounds to the back of the body is enough to strongly support the conclusion that Jones was facing away from his killer when the shots were fired.

8

The other aspect of the case that contradicts a self-defense narrative is the evidence of premeditation and motive. The text messages presented at trial substantially support the conclusion that Brown *planned* to kill Jones because he thought him untrustworthy. Over a series of messages, he indicated he did not trust Jones due to the Pennsylvania case, discussed consequences for snitching, and referenced shooting up Jones's car. His conversation with Michael Dunbar ended with Dunbar's suggestion that they plan the shooting.

The cases Brown relies on provide him little assistance. The evidence to support jury instructions on self-defense in each only underscores the lack of such evidence in the case before us. In *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178, the prosecution's chief witness testified that the murder victim was choking the wheelchair-bound defendant when the defendant shot him. Brown has no such evidence that Jones's conduct caused him fear. *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1263, involved a chaotic shooting at a party with significant evidence that the defendant endured some threat to his safety: there was a bullet hole in his jacket and two witnesses testified that someone shot at the defendant before he returned fire. Brown points to the strange parallel that one of the victims in *Viramontes* sustained a gunshot wound to the hand, but this similarity is merely superficial. (*Ibid*.)

In short, there was insufficient evidence to support a theory that Brown shot Jones with the subjective belief—reasonable or unreasonable—that he needed to defend himself. And even if one could marshal minimally sufficient evidence to warrant an instruction on voluntary manslaughter, the compelling evidence that Jones's death was a planned and premeditated killing would make any instructional error demonstrably harmless.

9

2.    *Presentence Credits*

A week after Jones was killed, Brown was stopped and searched, yielding a loaded gun and cocaine on his person.  He was charged with several counts and pled guilty to possession of cocaine with a loaded firearm.  (Health & Saf. Code, § 11370.1, subd. (a).)  He admitted a strike prior and was sentenced to six years in state prison.  Over a year after this arrest, while he was serving his sentence for the cocaine possession conviction, he was charged with four new counts—the murder of Jones, attempted murder, assault with a semiautomatic firearm, and discharging a firearm in a grossly negligent manner.  Brown was convicted by jury (on all counts except negligent discharge of a firearm), and at his sentencing, the trial court resentenced him for the cocaine possession case.  It set his terms to run consecutively and applied Penal Code section 2933.2[1] (which prohibits defendants convicted of murder from earning presentence conduct credits) such that Brown received no presentence conduct credits.  It then awarded 923 days of actual custody credits.

Brown challenges the application of section 2933.2 to the period of custody following his cocaine possession charge and preceding his murder charge.  He also challenges the award of actual custody credits.  We address these contentions in turn.

a.    *Conduct Credits*

It is helpful at the outset to review the credit system in general and two statutes that limit a defendant's accrual of credits in certain situations.  Presentence and postsentence credit are distinct from one another and

---

[1]    Unless otherwise specified, all further statutory references are to the Penal Code.

governed by "independent . . . schemes." (*People v. Buckhalter* (2001) 26 Cal.4th 20, 30.) This case involves the presentence credit system. In addition to actual credit, which accumulates from time spent in custody,[2] detainees in local institutions are usually able to earn credit against their eventual sentence for good behavior and work performed. These " 'conduct credits' " are authorized by section 4019. (See *People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.) But their ability to earn presentence conduct credits is limited if they are convicted of certain offenses.

Section 2933.1 restricts presentence conduct credits to no more than 15 percent of the overall time spent in local custody for defendants convicted of a violent felony. Specifically, subdivision (c) states, "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." Reference to subdivision (a) makes it clear that this limitation applies to "any person who is convicted of a [violent] felony offense listed in subdivision (c) of Section 667.5."

Section 2933.2 employs a parallel structure and similar language to totally eliminate presentence conduct credit for defendants convicted of murder. Its subdivision (c) says, "Notwithstanding Section 4019 or any other provision of law, no credit pursuant to Section 4019 may be earned against a period of confinement in, or commitment to, a county jail . . . following arrest for any person specified in subdivision (a)." Subdivision (a), in turn, specifies those restricted under subdivision (c) as "any person who is convicted of murder, as defined in Section 187." Thus, subdivision (a) of both code

---

2    Actual credit is governed by section 2900.5.

sections—2933.1 and 2933.2—restricts *postsentence* conduct credit accrual for those convicted of violent felonies or murders (in addition to clarifying each section's subdivision (c)).

The scheme may seem straightforward enough, but these credit-limiting statutes have not always proven easy to apply to defendants with multiple convictions that do not all trigger the same limitation. Here, Brown argues the court erred by applying section 2933.2 to the period between July 7, 2016 (the date of his arrest on the cocaine possession charge) and July 19, 2017 (the date he was charged with murder). A very similar issue was presented in *People v. Baker* (2002) 144 Cal.App.4th 1320, where the appellate court upheld the blanket application of section 2933.1, subdivision (c) to a defendant's presentence custody period for an earlier nonviolent offense. (*Id*. at p. 1324.) Brown makes some attempt to argue that *Baker* is distinguishable. More fundamentally he contends that it was undercut by principles established in the Supreme Court's later decision *Reeves, supra,* 35 Cal.4th 765.

Before we address the specifics of Brown's argument, we must provide some relevant decisional history starting with *People v. Ramos* (1996) 50 Cal.App.4th 810 (*Ramos*), which supplied the rationale for the *Baker* decision. *Ramos* addressed whether section 2933.1 applied uniformly to a defendant's presentence custody period when he was ultimately convicted of both violent and nonviolent offenses. The defendant, who pleaded guilty to various counts after a robbery spree, argued that because one of his convictions was not for a violent felony, it should be distinguished for the purpose of calculating his presentence conduct credits. (*Ramos*, at p. 817.) In rejecting this view, the appellate court determined that "section 2933.1 applies to the offender not to the offense and so limits a violent felon's

12

conduct credits irrespective of whether or not all his or her offenses [are violent under] section 667.5." (*Ramos*, at p. 817.) It further commented that the Legislature "could have confined the 15 percent rule to the defendant's violent felonies if that had been its intention." (*Ibid*.)

*Ramos* created a roadmap for resolution of similar cases and was widely relied on for the nearly 10-year period between its publication and the Supreme Court's *Reeves* decision. (See *Reeves, supra,* 35 Cal.4th at p. 774 ["All other published decisions addressing the same issue about presentence credits have followed *Ramos*."].) Its rationale that section 2933.1 applies to offenders and not to the offense has been utilized by courts confronting several factual variations on the custody credit issue. (See, e.g., *Nunez, supra*, 167 Cal.App.4th at pp. 766–768 [concluding under *Ramos* that the 15 percent limitation applied to all time spent in custody for a defendant who was convicted of robbery (a qualifying offense),[3] released on probation, and later charged and held for unlawful driving (a nonqualifying offense)].) *Baker, supra*, 144 Cal.App.4th 1320, was one of these decisions.

In *Baker*, the defendant spent several months in presentence custody on a nonviolent offense before being charged with a violent felony. He was eventually sentenced (or resentenced, as to his earlier convictions) on three convictions at the same hearing. In calculating his presentence conduct credits, the trial court applied the 15 percent limitation to the five months of time Baker spent in jail due to his first felony. (144 Cal.app.4th at pp. 1325–1326.) Although during this period Baker was not being held for a violent offense, the appellate court approved of applying section 2933.1 uniformly to

---

3      By qualifying offense, we mean a violent felony under section 2933.1 or a murder under section 2933.2. We also refer to these throughout as limiting offenses or qualifying convictions.

all his presentence custody based on *Ramos*'s reasoning that "section 2933.1 applies to the offender not to the offense." (*Baker*, at p. 1328.) It concluded that, at least with respect to consecutive sentences, the section applies to all presentence custody periods served by a defendant who is eventually convicted of a violent felony without regard to "the timing of each conviction" (*id*. at p. 1327), "even if the presentence custody time on the nonviolent offense was served prior to the commission of the violent offense." (*Id*. at p. 1324.)

*People v. Marichalar* (2003) 144 Cal.App.4th 1331 (*Marichalar*) followed *Baker*'s lead on similar facts. It applied *Ramos* to resolve the appeal of a defendant who was initially held for drug possession (a nonqualifying offense) and subsequently charged with kidnapping (a qualifying offense). He argued that the earlier custody period attributable only to his drug case was distinct, and the 15 percent presentence credit limitation of section 2933.1 should not apply to that period. The court relied on *Ramos* to conclude it did. (*Id*. at p. 1337.) "That a defendant, currently convicted of a violent felony, was not a violent felon at the time he served his or her presentence custody on the nonviolent offense is irrelevant." (*Ibid*.)

In late 2002 and early 2003, the California Supreme Court indicated it would take up the general issue of limitations on conduct credits when it granted review in a series of cases addressing the scope of section 2933.1, including *Reeves*, *Baker*, and *Marichalar*. *Reeves, supra*, 35 Cal.4th 765 was the lead case and became the definitive guide when it was decided in 2005. In *Reeves*, the defendant was convicted in separate proceedings of violent and nonviolent felonies respectively resulting in 5- and 10-year sentences that ran concurrently. The Department of Corrections and Rehabilitation applied

14

section 2933.1, subdivision (a)[4] uniformly in calculating his release date, subjecting Reeves to the 15 percent credit limitation even for the period after he completed his sentence for the violent felony (the shorter of his two terms). (*Reeves*, at pp. 769–770.) Reeves challenged this result in a writ petition, arguing that "section 2933.1(a) has never restricted his ability to earn worktime credit against the longer concurrent sentence [for the nonviolent felony] because, for purposes of that sentence, he is *not* convicted of a violent felony offense."[5] (*Id.* at p. 770.)

In considering whether section 2933.1 continued to limit Reeve's conduct credits after he completed his sentence for the violent felony, our high court focused its analysis on the phrase, "any person who is convicted of a [violent] felony offense" in subdivision (a). (*Reeves, supra,* 35 Cal.4th at p. 770.) It determined this language was ambiguous, at least as applied to

---

4    As noted above, subdivisions (a) of both sections 2933.1 and 2933.2 limit *postsentence* accrual of worktime credits for prisoners.

5    Although *Reeves, supra,* 35 Cal.4th 765 considered the effect of the credit limitation clause of section 2933.1, subdivision (a) on a prisoner's *postsentence* credits after his qualifying sentence elapsed, much of the opinion is still relevant to the issue before us—whether the prohibition on *presentence* conduct credits under section 2933.2, subdivision (c) reaches a custody period from before a defendant is charged with murder. Since sections 2933.1 and 2933.2 largely mirror each other in both structure and wording, cases that interpret either inform our review. See, for example, *In re Maes* (2010) 185 Cal.App.4th 1094, 1107 (*Maes*), which looked to *Reeves's* analysis of section 2933.1 to faithfully interpret section 2933.2: "In construing [the] phrase ['is convicted'], we believe it is appropriate to apply the Supreme Court's reasoning in *Reeves* to our construction of section 2933.2 because both section 2933.1 and 2933.2 are limitations on a prisoner's accrual of postsentence conduct credit. Ordinarily, '[w]ords or phrases common to two statutes dealing with the same subject matter must be construed in pari materia to have the same meaning.'"

15

the facts of the case. (*Ibid*.) Although the broad legislative intent of the section was to "protect the public by delaying the release of prisoners convicted of violent offenses," that did not "in the face of ambiguous statutory language, answer the specific, practical questions of how long and under what circumstances release is to be delayed." (*Id*. at p. 771.) *Reeves* considered four potential applications of the clause "is convicted" to resolve the question of whether section 2933.1 extends to both of an offender's concurrent sentences when only one of them independently triggers the limitation.

First, the court rejected outright an interpretation of "is convicted" that would bar an offender for life from earning more than 15 percent conduct credits after a conviction for a violent offense. Taking the present tense as determinative, the court explained that "the Legislature typically uses different language when it intends to impose a continuing disability based on criminal history. Credit restrictions, enhancements and alternative sentencing schemes based on criminal history usually employ the past perfect tense ('has been convicted' or 'previously has been convicted') rather than the present tense ('is convicted')." (*Reeves, supra*, 35 Cal.4th at pp. 771–772.)

Second, the court considered the People's position based on *Ramos* that the clause "applies to offenders rather than to offenses" such that it limits credits for an offender's "entire period of confinement" so long as he serves some time for a violent felony. (*Reeves, supra*, 35 Cal.4th at p. 772.) The opinion likewise rejected this logic, at least as applied to concurrent terms, because no principle of law dictates multiple "overlapping terms necessarily constitute a single, unified term of confinement for purposes of worktime credit." (*Id*. at p. 773.) But the court indicated it agreed with the People's reasoning as applied to consecutive determinate terms, since they merge

16

"into a single, 'aggregate term of imprisonment' " under the determinate sentencing law. This merger renders any attempt to distinguish the component parts of the sentence a "meaningless abstraction" (*id.* at p. 773), and the indivisibility of the sentence means the phrase "is convicted" logically applies to the offender's entire time in prison. (*Id.* at pp. 772–733.)

Third, the court considered and rejected Reeves's position that section 2933.1 never had any bearing on his nonviolent conviction. He argued that he accrued credits at two different rates—15 percent on his violent conviction during his five-year sentence, and 50 percent at all times on his nonviolent conviction. The court observed that, if it accepted Reeves's interpretation, the result would frustrate the legislative intent to keep violent felons in prison longer and also undermine the plain language of the statute. (*Reeves*, *supra*, 35 Cal.4th at pp. 777–778.) During the first five years when Reeves was concurrently serving both his violent and nonviolent sentences, he "most certainly '[was] convicted of a [violent] felony offense.' " (*Id.* at p. 778.) The phrase "is convicted" thus applied to him at that time.

Instead, the court adopted a fourth option, applying the statute's 15 percent limitation to Reeves's first five years, when he was serving his violent felony sentence, but not to his subsequent prison term because after the shorter sentence ended, he was *no longer presently convicted* of a violent felony. (*Reeves*, *supra*, 35 Cal.4th at pp. 780–781.) In sum, the court's solution effectuated the legislative intent of section 2933.1 without straining the clause "is convicted" by making it apply indefinitely.

*Reeves* went on to discuss presentence credits and endorse *Ramos*'s reasoning—that section 2933.1, subdivision (c) applies to the offender and not the offense—at least in the context of cases like *Ramos*. While the court did not describe the precise boundaries of the *Ramos* rationale, the discussion

17

indicated that such limits exist: *Ramos* "makes sense in the context in which the court spoke—that of presentence credits authorized by section 4019 and limited by section 2933.1(c) [for a] period of presentence confinement [that] is indivisibly attributable to all of the offenses with which the prisoner is charged and of which he is eventually convicted." (*Reeves*, *supra*, 35 Cal.4th at pp. 775–776; see also *Maes*, *supra*, 185 Cal.App.4th at p. 1105, fn. 7.)

*Reeves* became the only express statement from the Supreme Court on this issue for several years.[6] But other contemporaneous actions by the high court also inform our interpretation of the *Reeves* decision. That is because, as previously noted, while review was pending in *Reeves* the court also granted review in *Baker* and *Marichalar*. After *Reeves* became final, the Supreme Court took the unusual step of dismissing review in *Baker*[7] and *Marichalar*[8] while at the same time ordering that those decisions be

---

[6] It was followed by *In re Pope* (2010) 50 Cal.4th 777, 785 [section 2933.1 applied even though a defendant's qualifying violent felony convictions were stayed] and *People v. Duff* (2010) 50 Cal.4th 787, 795 [a stayed sentence for a murder conviction did not remove the defendant from section 2933.2's target population.].

[7] In *Baker, supra*, 144 Cal.App.4th 1320, a Reporter's Note states: "This opinion, filed December 20, 2002, was previously reported at 104 Cal.App.4th 774 pursuant to the Court of Appeal's certification for partial publication. Review was granted February 25, 2003 (S112982); on November 15, 2006, the Supreme Court remanded the cause to the Court of Appeal and ordered partial publication of the opinion."

[8] In *Marichalar, supra*, 144 Cal.App.4th 1331, a Reporter's Note states: "This opinion, filed June 26, 2003, was previously reported at 109 Cal.App.4th 1513. Review was granted July 28, 2003 (S117796); on November 15, 2006, the Supreme Court remanded the cause to the Court of Appeal and ordered publication of the opinion."

republished.[9] The effect of the republication orders was to restore the precedential effect of both opinions. While we would not go so far as to treat these orders as an express approval of the results and rationales in *Baker* and *Marichalar*, the affirmative action by the Supreme Court holds significance.

With this background in mind, we return to Brown's arguments. At the outset, we are unpersuaded by his contention that *Baker* is distinguishable because it dealt only with determinate terms whereas his sentence includes both determinate and indeterminate sentences. He believes this distinction is significant because his terms did not merge into a singular whole. Although *Baker* did explain that concurrent determinate sentences necessarily merge under California law, its holding does not therefore dictate that Brown's indeterminate terms fall outside the scope of section 2933.2. (*Baker*, supra, 144 Cal.App.4th at p. 1328.) Brown reads both *Reeves* and a later case, *In re Tate* (2006) 135 Cal.App.4th 756 (*Tate*)[10] as supporting his position that he escapes the blanket application of section 2933.2 due to his

---

[9] Under former California Rules of Court, rule 8.1105(e), a grant of review in a case depublished the appellate opinion and made it permanently uncitable thereafter, barring some affirmative action taken by the Supreme Court.

[10] *Tate* is distinguishable in more than one way. An inmate who was serving a sentence for a violent felony committed a nonviolent offense while in prison; he pled guilty to the latter, received a consecutive sentence, and then contested the application of section 2933.1, subdivision (a) to limit his postsentence worktime credits as to the second offense *after* his first sentence was completed. (135 Cal.App.4th at p. 761.) Relying on *Reeves*, the *Tate* court found in his favor, distinguishing his in-prison sentence from the general sentencing scheme that governs out-of-prison consecutive sentences. (*Id.* at p. 765.)

mixed (and thus disaggregated) terms. But in doing so, he ignores the opinion that speaks most clearly to the issue.

*People v. McNamee*, (2002) 96 Cal.App.4th 66, 73–74, another opinion that relies on *Ramos, supra*, 50 Cal.App.4th 810, confronted the application of section 2933.2 to a defendant who was convicted of murderer and received a sentence composed of both determinate and indeterminate terms. In concluding the presentence credit prohibition of subdivision (c) applies uniformly to such a sentence, the *McNamee* court noted that a contrary holding would undermine the law by perversely awarding a murderer who "commit[ed] sentence-enhancing conduct, such as gun use" more presentence conduct credits than his or her counterpart who did not use a gun. It concluded that "[s]ection 2933.2 should be interpreted so as to avoid that anomalous result." (*McNamee*, at p. 73.) We find no reason to depart from this holding.

Brown's more compelling argument is not about the purported merger or separation of the components of his sentence, but rather the timing of each of his charges in light of the statutory language. He points out that section 2933.2, subdivision (c) specifically confines its own scope to the period "*following arrest* for any person specified in subdivision (a)," suggesting it does not become operative until an arrest for a murder takes place. (Italics added.) This language could support the inference that the Legislature intended the statute to apply to defendants only after their arrest for a qualifying offense. In a case such as the one before us, where the defendant is already in custody for a nonqualifying offense, it could be argued that subdivision (c) would attach when defendant is charged with murder, but not before.

While there is some support in the statutory language for Brown's position that section 2933.2, subdivision (c) does not reach the earlier custody period attributable only to his cocaine possession offense, his argument is nonetheless built on the untenable premise that *Reeves, supra*, 35 Cal.4th 765 implicitly disapproved *Baker, supra*, 144 Cal.App.4th 1320 and *Marichalar*, *supra,* 144 Cal.App.4th 1331. We decline to read *Reeves* in this manner given the postreview procedural history of those cases. The Supreme Court took the affirmative action—where it need not have acted at all—to order both appellate opinions republished *after Reeves* was decided. This casts serious doubt on any interpretation of *Reeves* that would undermine the two appellate cases that confronted the precise issue before us almost 20 years ago.

Respecting our role as an intermediate appellate court, we believe the appropriate course is to follow existing precedent as reflected in *Baker, supra*, 144 Cal.App.4th 1320 and *Marichalar*, *supra,* 144 Cal.App.4th 1331, leaving it to the Supreme Court to reexamine those decisions if it now believes they were in error. We thus affirm the trial court's application of section 2933.2 to all of Brown's presentence custody, including the period attributable solely to his cocaine possession charge.

b.     *Actual Credits*

Brown's assertion that his actual custody credits were calculated incorrectly is a far simpler issue to address. The probation department initially calculated 890 days of actual credit based on a December date for his sentencing hearing. When the hearing was pushed forward to January, the Department's updated calculation reflected 923 days in actual custody. Relying on this calculation, the court awarded Brown 923 days of actual custody credits, but the abstract of judgment and the minute order both

reflect the earlier (outdated) figure of 890 days. Where these parts of the record conflict, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) But fixing this clerical error does not entirely resolve the issue, because the probation department's calculation was based on an incorrect date of arrest. It lists Brown's arrest as July 8, 2016,, but Brown was taken into custody on July 7, 2016. He is thus entitled to one additional day of actual credit, bringing his total up to 924 days.

3.     *Enhancement Issues*

According to Brown, some of the trial court's comments at sentencing indicate it was unaware of its discretion to strike his firearm enhancements. Brown claims he is therefore entitled to a new hearing on remand. Our review of the record suggests no such confusion on the part of the trial judge. In fact, we find affirmative indications the court was fully aware of its discretion. But Brown's other enhancement-related challenge is meritorious. The gang enhancements added to his sentence were unauthorized under clearly established law and must be stricken.

Brown was found guilty in count 1 of attempted murder (§§ 187, subd. (a), 664), guilty in count 2 of assault with a semiautomatic firearm (§ 245, subd. (b)), and guilty in count 4 of murder (§ 187, subd. (a)). The jury also determined that Brown committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1), and (b)(5)), and personally used a firearm (§§ 12022.5, subd. (a), and 12022.53, subds. (b), (c), and (d)). Brown admitted a previous robbery conviction that qualified as a prison prior, serious felony prior, and strike prior. He was sentenced to a total prison term of 140 years to life as follows:

22

On count 1, Brown received an indeterminate term of 60 years to life: 15 to life for attempted murder, doubled due to his strike prior (§§ 187, subd. (a), 664; §§ 667, subd. (e)(1), and 1170.12, subd. (c)(1)), with 20 years added for a firearm use enhancement (§ 12022.53, subd. (c)), and 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)). On this conviction, the court struck the serious felony prior that would have added 5 years, and stayed an additional firearm use enhancement.

On count 2, the court imposed and stayed a determinate 9-year upper term for assault with a firearm (§ 245, subd. (b)), a 10-year upper term for a firearm use enhancement (§ 12022.5 subd. (a)), and a 4-year upper term for a gang enhancement (§ 186.22, subd. (b)(1)(A)).

On count 4, Brown received an indeterminate term of 80 years to life: 25 to life for murder, doubled due to his strike prior (§ 187, subd (a); §§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), 25 years to life for a firearm use enhancement (§ 12022.53, subd. (d)), and an additional 5-year enhancement for his serious felony prior (§ 667.5, subd. (a)(1)). On this conviction, the court stayed two additional firearm use enhancements and a 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)).

a.    *Firearm enhancements*

Relatively recent amendments to sections 12022.5, subdivision (c) and 12022.53, subdivision (h) gave sentencing courts discretion to strike or dismiss firearm enhancements in the interest of justice that would otherwise be required under the sections. These changes became effective on January 1, 2018. (Stats. 2017, ch. 682, §§ 1–2; *People v. Zamora* (2019) 35 Cal.App.5th 200, 206.) Brown was sentenced in January 2019. If the record shows the trial court was unaware of the scope of its discretion at sentencing, remand is justified. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) But "[i]f the

23

record demonstrates on its face that the sentencing court was aware of its statutory authority . . . it may be presumed that the court did exercise its discretion . . . ." (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) Generally, the trial court's order is " ' "presumed correct" ' " and any claim of error " ' "must be affirmatively shown" ' " by the appellant. (*People v. Johnson* (2016) 1 Cal.App.5th 953, 960; accord *People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1523.)

In an effort to make this showing, the defendant points to two comments by the trial judge at his sentencing hearing. Immediately before it imposed sentence on the murder conviction, the court stated, "I have to do what we have to do." Later, when the court was advised by the prosecutor of its new discretion to strike the serious felony, it struck the enhancement on count 1 but imposed it on count 4, remarking: "The five-year prior on Count 1 is going to be stricken, PC 1385(c),[11] because I think that's just piling on. Okay. You got all the gang allegations, the gun allegations, that's just too much, it's excessive. . . ."

Brown asserts these comments suggest the court was unaware of its discretion to strike his *firearm enhancements*. To reach this conclusion, we would need to accept the proposition that the court's exercise of discretion in one area shows it was ignorant of its discretion in another. The conclusion simply does not follow from the premise. Moreover, even if we were to entertain the idea, a contextual read of the sentencing transcript provides affirmative evidence that the court was generally aware of its discretion and usually imposed harsher terms on Brown based on his conduct.

---

11    Although the transcription specifies a nonexistent subdivision (c), the court's reference here was undoubtedly to section 1385, subdivision (b).

24

At sentencing, the court heard and considered defense counsel's motion to strike Brown's prior robbery conviction pursuant to its discretionary powers under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 and section 1385. Counsel asked the court to give Brown an opportunity to get out of prison someday. The court responded at length about the mitigating and aggravating circumstances in the case and expressed its concern for the losses suffered by everyone, including both families. But it ultimately denied the *Romero* motion, saying it had "thought about it" and decided "I am not going to strike the strike [prior]" because "it was a residential burglary, he hadn't done well on probations in between, and it just continued." The effect of this decision was to double Brown's time on the murder conviction, increasing it from 25 years to life to 50 years to life. It is clear from the record that the court was aware it could have been more lenient.

On count 2, the court also exercised its discretion to impose harsher terms. It gave Brown the upper terms of nine years for his assault conviction and 10 years for the firearm enhancement, both "based on the callousness" of his actions. Although these terms were stayed, the court's decision indicates it was aware of its discretion and thought Brown's conduct merited the most punitive result. The court also declined to accept defense counsel's suggestion to run Brown's life sentences concurrently, noting that the attempted murder was particularly callous.

Considered as a whole, the record paints a clear picture that the court knew of and exercised its discretion. The comments Brown points to do not change our analysis—in fact, taken in context, they further support our conclusion. The first comment was made after the court opined about the defendant's personal decisions and the environment he grew up in, saying "it creates a hostile situation where the gang influence becomes too great, and it

25

may have just become too great.  But this has been going on for just too many years.  And I have to do what we have to do." Given that this discussion came on the heels of the court's decision to deny the *Romero* motion, we do not read it as an indicator that the court was unaware of its discretionary power to strike the enhancements.  Rather, it expressed its reticence to impose a long prison sentence, but did so because gang influences and allegiance had become an intractable part of Brown's life.  The sentencing transcript is peppered with other candid statements along these lines.

The second set of comments also indicates the court was aware of and in fact exercised its discretion.  It only used the terms "too much" and "excessive" *after* it decided to strike the serious felony enhancement as to count 1:  "[T]he five-year prior on Count 1 is going to be stricken, PC 1385(c), because I think that's just piling on.  Okay.  You got all the gang allegations, the gun allegations, that's just too much, it's excessive." Here, the court did not mean the sentence was excessive, but rather that it *would have become excessive* without removal of the serious felony enhancement.  That the court only struck the enhancement on count 1 and not on count 4 further shows it considered the overall sentence well balanced after removal of one enhancement.

In addition to reading the sentencing transcript in context, there is further affirmative evidence that the court understood its discretion.  Not only had the amended statute for firearm enhancements been operative for a year, but both the People and the defense called the court's attention to this change in their respective sentencing memoranda.  We assume, expect, and believe that the court fully considered both memoranda.

b. *Gang enhancements*

Brown challenges the 10-year gang enhancements that were added to his murder and attempted murder convictions pursuant to section 186.22, subdivision (b)(1). He asserts these were unauthorized under *People v. Lopez* (2005) 34 Cal.4th 1002. The People agree, as do we. *Lopez* found that "the Legislature intended section 186.22(b)(5) to encompass both a straight life term as well a term expressed as years to life . . . and therefore intended to exempt those crimes from the 10-year gang enhancement in subdivision (b)(1)(C)."[12] (*Lopez*, at p. 1007.) Because Brown received indeterminate life sentences for murder and attempted murder, both of these convictions are exempt from the 10-year enhancement of subdivision (b)(1)(C) and subject only to the 15-year minimum parole eligibility of subdivision (b)(5), even if it will have no practical effect in his case. (See *Lopez*, at pp. 1008–1009; see also *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1238–1239.)

---

[12] Section 186.22, subdivision (b)(5) imposes a parole limitation on defendants convicted of a gang-related felony that is punishable by a life term in state prison; they "shall not be paroled until a minimum of 15 calendar years have been served."

DISPOSITION

The judgment is modified to reflect that Brown accumulated 924 days of actual credits under section 2900.5.  The unauthorized 10-year gang enhancements to Brown's murder and attempted murder convictions under section 186.22, subdivision (b)(1) are stricken.  As so modified, the judgment is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


DATO, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.